**Yvette BRADLEY,**

v.

**UNITED STATES of America, et al.**

**No. CIV. A. 00–2317.**

United States District Court,
D. New Jersey.

Sept. 10, 2001.

David L. Harris, Alix R. Rubin, Lowenstein Sandler, PC, Roseland, NJ, Attorneys for Plaintiff.

J.C. Salyer, American Civil Liberties Union of New Jersey Foundation, Newark, NJ, Attorneys for the ACLU–NJ.

Susan C. Cassell, Assistant United States Attorney, Robert J. Cleary, United States Attorney, Newark, NJ, Attorney for Defendants.

## LETTER OPINION AND ORDER

POLITAN, District Judge.

Dear Counsel:

This matter comes before the Court on a motion to dismiss and/or for summary judgment by Defendants. Oral argument was heard on July 23, 2001. Thereafter, the parties submitted supplemental briefs

addressing whether the Court could hold an evidentiary hearing for purposes of determining whether qualified immunity shielded Defendants from liability. The Court declines to hold such a hearing, and will now decide the pending motion.

■ The Court will treat this as a summary judgment motion because material beyond the pleadings has been considered. Fed.R.Civ.P. 12(b); 56.[1]

## STATEMENT OF FACTS

On April 5, 1999, Plaintiff, Yvette Bradley, ("Plaintiff") was returning from a vacation in Jamaica when she was stopped United States Customs Inspectors at Newark International Airport. Plaintiff was singled out for a luggage search, subjected to a pat down search, and ultimately released by Customs officers. No contraband was found on Plaintiff's person.

Plaintiff filed this lawsuit on May 12, 2000 against the United States of America, the United States Customs Service and certain agents thereof. An Amended Complaint was filed on February 6, 2001 naming three individual Customs inspectors as defendants. The gravamen of Plaintiff's Complaint is that she was discriminated against when she was selected for a search, claiming that the reason she was selected is because she is a black woman. Plaintiff further claims that the search was unreasonably intrusive and invaded Plaintiff's privacy rights.

Defendants contend that Plaintiff was initially selected for a luggage search because, based on their observations, suspicions were raised. Defendants claim that Plaintiff was wearing an unusual hat under which drugs could be secreted, was wearing clothing which appeared too heavy considering she had just come from a warm climate, and the country from which Plaintiff had just arrived, Jamaica, is a known source country for narcotics. While the parties disagree on whether Plaintiff's dress was loose-fitting or snug, it is undisputed that Plaintiff was wearing a long dress with a jacket over it, was wearing an unusual hat, and was not wearing underwear.

Plaintiff alleges in the Amended Complaint that the Customs Officer who initially selected Plaintiff for a luggage search was Defendant Officer Anthony Scaringella ("Scaringella"). Defendants deny this, contending that it was not Scaringella who initially selected Plaintiff for the search, but that Plaintiff was sent to Scaringella's belt by another officer, and Scaringella performed the luggage inspection. Plaintiff's brief in opposition to this motion appears to concede that in fact it was not Scaringella who initially selected Plaintiff for further inspection. Defendants have submitted sworn statements indicating that Plaintiff was belligerent and hostile throughout the luggage search, using profanity throughout. Scaringella Decl., ¶¶ 10–14, Townes Decl., ¶¶ 3–7. After

---

1. Plaintiffs' attorneys state in their opposition brief that this motion should not be considered as one for summary judgment, as more discovery is needed. Plaintiff has not, however, filed a Rule 56(f) affidavit detailing why treatment as a summary judgment motion would be improper and why more discovery is needed. *See* Fed.R.Civ.P. 56(f). A Rule 56(f) motion must "identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been

obtained." *St. Surin v. Virgin Islands Daily News, Inc.*, 21 F.3d 1309, 1314 (3d Cir.1994); *Hancock Industries v. Schaeffer*, 811 F.2d 225, 229–30 (3d Cir.1987); *Securities & Exchange Comm'n v. Antar*, 120 F.Supp.2d 431, 440–41 (D.N.J.2000). Nevertheless, the Court is not convinced that further discovery would change the Court's ruling today-because accepting all of Plaintiff's allegations as true, the Court finds herein that Defendants are entitled to judgment as a matter of law.

Scaringella searched Plaintiff's suitcase, backpack, and purse, he instructed Plaintiff to follow two female officers, Defendants Jacqueline Castleberry ("Castleberry") and Michelle Mazzarulli Quinlan ("Mazzarulli")[2] into a small room. Scaringella testifies that his suspicions were raised based on Plaintiff's hostile behavior. Scaringella Decl., ¶ 14.

Plaintiff contends that inside of this room she was subjected to an "abusive" "involuntary non-routine personal search." Am. Compl., ¶ 27. Plaintiff was first told to remove her shoes, and no illegal material was found inside. Plaintiff was then told to remove her jacket and to stand against the wall with her legs spread apart and her palms to the wall. *Id.*

Then, Plaintiff asserts, either Mazzarulli or Castleberry approached Plaintiff from behind and through her "sheer slip dress, proceeded to slowly rub her hands all over and beyond the surface of Ms. Bradley's entire body, including her breasts and the inner and outer labia of her vagina, completely disregarding the fact that it was apparent there were no underwear or contraband under Ms. Bradley's dress." Am. Compl., ¶ 27. The declarations of Castleberry and Mazzarulli suggest that it was Mazzarulli who conducted the pat down search. Castleberry Decl., ¶ 12; Mazzarulli Decl., ¶ 16. Plaintiff appears to accept this fact as true. Bradley Aff., ¶¶ 25, 26, 28.

When the search concluded, Plaintiff immediately filed a complaint with Defendant Robert Lucania, the Customs Supervisory Inspector on duty on the evening of April 5, 1999. Plaintiff indicates that the total course of events, including the subsequent filing of a complaint, lasted forty-five minutes. Bradley Aff., ¶ 34.[3] The following day, Plaintiff contacted Defendant Ricardo Bowen, the Passenger Service Representative of Customs at Newark Airport, and again lodged a complaint and requested the badge numbers for all Customs officers involved in the April 5th selection and search. Plaintiff asserts that Defendant Bowen later notified Plaintiff that his investigation revealed that the reason Plaintiff was initially chosen for a search was because of the unusual hat she was wearing. Am. Compl., ¶ 31. Plaintiff contends that this could not have been the true reason for the search because a group of young white male individuals who were wearing baseball caps were not selected by Customs officers for a search. *Id.*, ¶ 32.

Plaintiff further contends that black women are disproportionately selected and searched by Customs officers on the basis of their race and gender and that the United States Customs Service has a custom and policy of promoting such behavior. *Id.*, ¶ 40. The Complaint speaks generally of a class of black women and avers that there is a pattern amongst Customs officials in disproportionately selecting black women for searches. This case, however, has not been pled nor certified as a class

---

2. The Court will refer to Michelle Mazzarulli Quinlan as "Mazzarulli" as Plaintiff's Amended Complaint primarily uses this name.

3. Plaintiff's attorney asserts that the luggage search took 25 minutes, and that Plaintiff was "permitted to leave" only after 45 minutes had elapsed. Pl. Br. at 10. Plaintiff's attorney infers therefore that the pat down must have lasted about 20 minutes. Plaintiff's own affidavit, however, contradicts this assertion.

Plaintiff states that the whole series of events lasted 45 minutes, including the time Plaintiff spent speaking with Lucania and filing a complaint after the pat down occurred. Bradley Aff., ¶¶ 29–34. Therefore, the pat down could not have taken as long as 20 minutes. Mazzarulli claims that the pat down took only two minutes. Mazzarulli Decl., ¶ 24. Plaintiff makes no mention of how long the secondary search lasted. *See* Bradley Aff.

action. Yvette Bradley is the sole Plaintiff.

Plaintiff alleges that Mazzarulli, Castleberry, and Scaringella acted unlawfully in subjecting Plaintiff to a search without the requisite suspicion, and that she was held *incommunicado. Id.,* ¶¶ 49, 50. Plaintiff also specifically claims that Defendants Raymond W. Kelly, Samuel H. Banks, Charles Winwood, Ricardo Bowen, Kathleen Haage, and Robert Lucania (all agents of the U.S. Customs Service) in their official capacity:

> (a) improperly authorized, encouraged or directed Customs Inspectors to engage in non-routine personal searches, or condoned such searches, based on race and gender, which are unduly invasive and without sufficient legal basis;
> (b) recklessly allowed Customs Inspectors at Newark to conduct non-routine searches without independent evaluation by a Supervisor of whether a search was necessary and appropriate, thereby violating Customs' own internal rules;
> (c) failed to properly train and instruct Customs Inspectors to prevent race and gender from influencing the selection of persons to be examined or searched; and
> (d) failed to properly supervise and exercise reasonable control over Customs Inspectors at Newark Airport to prevent discrimination in the selection of passengers for examination and searches and to prevent excessively intrusive searches.

*Id.,* ¶ 51. Plaintiff maintains that as a result of her experience with Customs officers on April 5, 1999, she has suffered extreme emotional distress, mental anguish, humiliation, shame, embarrassment, and loss of personal integrity and dignity. *Id.,* ¶ 52.

Defendants argue that Plaintiff has failed to make out a *prima facie* case for each of the claims in the Amended Complaint. Defendants Scaringella, Mazzarulli, and Castleberry further argue that, even assuming the facts as alleged by Plaintiff were true, they are entitled to qualified immunity from suit.

## DISCUSSION

### A. Standard Governing Motion for Summary Judgment

All Defendants move for summary judgment on all claims alleged. The standard governing a summary judgment motion is set forth in Fed.R.Civ.P. 56(c), which provides, in pertinent part, that:

> [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Procedurally, the movant has the initial burden of identifying evidence that it believes shows an absence of genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the movant will bear the burden of proof at trial, the movant's burden can be discharged by showing that there is an absence of evidence to support the non-movant's case. *Id.* at 325, 106 S.Ct. 2548. If the movant establishes the absence of a genuine issue of material fact, the burden shifts to the non-movant to do more than "simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986). Of course, in deciding a summary judgment motion, the evidence must be viewed and all inferences must be drawn in favor of the non-moving party. *See id.* The Court notes, however, that "Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial." *Churchill v. IBM, Inc.,* 759 F.Supp. 1089, 1094 (D.N.J.1991)(*citing Celotex* 477 U.S. at 322, 106 S.Ct. 2548).

## B. *Bivens* Claims (Counts One–Four)

■ In *Bivens,* the Supreme Court created a cause of action against federal officers who, while acting under color of federal law, violate a citizen's constitutional rights. *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 397, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In analyzing a *Bivens* claim, the question of whether a plaintiff has been deprived of a right secured to them by the Constitution or federal statute is the same as it is in a § 1983 case. *See Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). A *Bivens* action, however, is the appropriate course where the allegation is that a federal officer violated the plaintiff's rights under color of federal law. *Brown v. Philip Morris Inc.,* 250 F.3d 789, 800 (3d Cir.2001).

■■ Like § 1983, a *Bivens* action is not a source of substantive rights, but is a mechanism by which plaintiffs can assert federal rights conferred upon them by the Constitution or federal statutory law. *See Alexander v. Whitman,* 114 F.3d 1392, 1400 (3d Cir.), *cert. denied,* 522 U.S. 949, 118 S.Ct. 367, 139 L.Ed.2d 286 (1997) (*quoting Baker v. McCollan,* 443 U.S. 137, 145, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Therefore, in order to establish a viable *Bivens* claim, a plaintiff must demonstrate a constitutional or federal statutory violation by a person who was acting under color of federal law. *See Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.), *cert. denied,* 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995) (*quoting Moore v. Tartler,* 986 F.2d 682, 685 (3d Cir.1993)). Here, Plaintiff alleges constitutional violations against federal Customs officers in Counts One through Four of the Amended Complaint.

### 1. Equal Protection Claim (Fourteenth and Fifth Amendments)

Count One alleges an equal protection violation cognizable under the Fourteenth and Fifth Amendments, based on Plaintiff's claim that she was subjected to a nonroutine invasive personal search without legal cause, and that Defendants true purpose in selecting her for the search was Plaintiff's race and gender.

■■ To make out a viable claim for a violation of equal protection rights, a plaintiff must demonstrate purposeful discrimination. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990). A plaintiff claiming discrimination on the basis of race and gender, must show that he or she was treated differently from others who were similarly situated, and that the difference in treatment was due to Plaintiff's race and gender. *See id.; Kuhar v. Greensburg–Salem School Dist.,* 616 F.2d 676, 677 n. 1 (3d Cir.1980). Once a plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the difference in treatment. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Stewart v. Rutgers,* 120 F.3d 426, 432 (3d Cir.1997)(indicating that Third Circuit law utilizes the *McDonnell Douglas* standard in equal protection cases); *McHenry v. Pennsylvania State*

*Sys. of Higher Educ.,* 50 F.Supp.2d 401, 409 (E.D.Pa.1999). The plaintiff must then rebut that reason as pretextual in order to set forth a viable equal protection claim. *See id.*

■ Here, Plaintiff contends that Defendants selected her for a luggage search because she was a black woman. She also claims that a disproportionate number of black women were selected for an initial luggage search on April 5, 1999, and that a group of white male individuals were not selected. No details have been pled as to how many other black women were selected, other than the fact that Lori Bradley, Plaintiff's sister and traveling companion (who is also black) was selected for an initial luggage search. Lori Bradley was not sent for a secondary search. Plaintiff claims that even though Scaringella, Mazzarulli, and Castleberry did not initially choose to search Plaintiff, they nevertheless "carried out" the policy of race and/or gender discrimination in searching Plaintiff's bags and person.

Defendants have countered that the reasons Plaintiff was selected for an initial luggage search are that: (1) she had just stepped off a plane which originated in Jamaica, a known source country for narcotics, (2) she was wearing an unusual hat under which drugs could have been secreted in the past, and (3) she was wearing attire which appeared bulky and more suited for cool weather, which was thought unusual since she was arriving from Jamaica. Scaringella Decl., ¶¶ 4–5. Additionally, Scaringella claims the flight on which Plaintiff arrived is considered a high-risk flight for narcotics and that he had been informed prior to searching Plaintiff that another individual on the same flight was found with narcotics. *Id.,* ¶¶ 6,7. Scaringella also states that Plaintiff became belligerent and hostile after initially selected, that she used profanity,

and that this behavior further heightened his suspicion and led to the secondary pat down search. *Id.,* ¶¶ 10–14. Plaintiff insists that she was not belligerent, and that she used profanity only twice throughout the course of events, stating "I don't f——ing believe this" two times. Bradley Aff., ¶¶ 23, 28.

The only other individual from the Jamaica flight who was subjected to a pat down search was a non-African-American male. *See* Lucania Decl., ¶ 14k; 7/23/10 Tr. of Oral Argument at 5, lines 1–6. Customs records revealed that the individual was reportedly found to be carrying contraband. *See id.*

Plaintiff has set forth no evidence which indicates that she was singled out for a search based on her race and/or gender. She asserts, however, that statistics will show that black women are selected more frequently for searches by Customs officers.

■ While statistical evidence in discrimination cases may support an inference of discrimination, such evidence must be linked to other evidence which also supports discriminatory intent. *See Contractors Ass'n of Eastern Pa., Inc. v. City of Philadelphia,* 893 F.Supp. 419, 428 (E.D.Pa.1995). If such additional evidence is lacking, the statistical evidence alone cannot be conclusive of discriminatory intent. *See O'Donnell Construction Co. v. District of Columbia,* 963 F.2d 420, 426 (D.C.Cir.1992).

This district has found that while statistical evidence may be sufficient to create a presumption of discrimination, a defendant can rebut that presumption with a neutral explanation for the different treatment. *See Glenn v. Scott Paper Co.,* 1993 WL 431161 at *17 (D.N.J.1993). The Sixth Circuit has indicated that even where statistical evidence shows that bias is general-

ly present, such evidence is rebutted by showing that bias did not play role in the specific action taken against the plaintiff. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1469 (6th Cir.1990). Here, Plaintiff has put forth no evidence which indicates purposeful discrimination on the part of by Customs officers who selected and searched her on the night of April 5, 1999. The Court is not convinced that Plaintiff's proposed statistical evidence could carry the weight of establishing discriminatory intent in this case.

■■■■ Moreover, Defendants have asserted legitimate nondiscriminatory reasons for having selected Plaintiff for the initial and secondary search. Plaintiff's contention that white males who were wearing hats were not searched is insufficient to rebut the legitimate reasons articulated by Defendants here.[4] Plaintiff's contention that other "similarly situated" individuals were not searched is unsupported. A similarly situated individual in this instance is not just a non-black male, but would be a non-black male returning from Jamaica wearing a similar hat and clothing under which drugs have been known to be secreted.[5] And although certain facts are disputed here, such as how many times Plaintiff used profanity and whether her dress was loose-fitting or tight, the disputed facts are not material.

It is undisputed that Plaintiff was arriving from Jamaica, a known source country for narcotics[6], and that Plaintiff was wearing an unusual hat under which Customs officials have found drugs in the past.

Having viewed the record in a light most favorable to Plaintiff, the Court finds that Plaintiff has failed to rebut Defendants' articulated reasons for searching Plaintiff as pretextual. For this reason, Plaintiff has failed to make out a *prima facie* show of an equal protection violation. Count One is therefore dismissed.

2. **Unreasonable Search/ Invasion of Privacy/ Due Process Claims (Fourth, Fifth, and Ninth Amendments)**

■■■■ Count Two asserts a claim for illegal search and seizure under the Fourth Amendment based on Plaintiff's claim of being searched without individualized or reasonable suspicion and that the search went "to an extent more invasive than justified." As previously stated, the search at issue here occurred at Newark International Airport where Plaintiff was arriving from a foreign country. Our international airports are considered "international gateways," and searches conducted by Customs officers therein are subject to the standards which apply to border

---

4. Plaintiff also removed her hat at some point and placed it on a table. There has been much discussion in this case about this hat. All parties agree that it is an unusual, one of a kind Anna Sui couture hat which fits snugly on the head and has two braids hanging down on either side. Defendants assert that this is a type of hat under which drugs have been known to be secreted, Plaintiff counters that Defendants did not even search the hat. Defendant Mazzarulli asserts that she did observe the interior of the hat and saw no contraband therein. *See* Mazzarulli Decl., ¶¶ 13,-14.

5. Plaintiff's reliance on *United States v. Jennings* is inapposite here because that case had nothing to do with a border search, but was a traditional Fourth Amendment search by DEA officials on a passenger flying domestically. As articulated herein, border searches are subject to wholly different standards than traditional searches not conducted at our borders. *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

6. Customs procedure permits Customs officers to consider a person's country of departure as a factor in deciding whether a search is appropriate. 1997 U.S. Customs Personal Search Handbook, at 10.

searches. *Saffell v. Crews,* 183 F.3d 655, 657 (7th Cir.1999)(*citing United States v. Johnson,* 991 F.2d 1287, 1290 (7th Cir. 1993)). Different standards apply to searches at our nation's borders than that which apply to traditional Fourth Amendment searches. An individual coming into this country has less privacy rights upon entering than when searched elsewhere within our borders. *United States v. Montoya de Hernandez,* 473 U.S. 531, 539–40, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). This is so because the United States has a greater interest in protecting itself at its borders. *See id.*

 Routine border searches are considered reasonable *per se* simply because they take place at our nation's borders. *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977). Routine border searches may freely take place without reasonable suspicion, probable cause, or a warrant. *Id.* at 538, 105 S.Ct. 3304. Furthermore, federal statutes provide that "all persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agent of the Government under such regulations." 19 U.S.C. § 1582; 19 U.S.C. § 1496; 19 C.F.R. § 162.6. Routine patdown searches by customs officials at our borders are considered "minimally intrusive" searches. *United States v. Charleus,* 871 F.2d 265, 268 (2d Cir.1989).

 Non-routine searches at our borders, on the other hand, require that the Government have at least "reasonable suspicion" of criminal activity to conduct the search. *United States v. Montoya de Hernandez,* 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). The Supreme Court has noted that reasonable suspicion to conduct a nonroutine search exists when a Customs officer has a "particularized and objected basis for suspecting the particular

person" is carrying contraband. *Id.* at 541–42, 105 S.Ct. 3304.

Plaintiff asserts that the search which occurred here was non-routine and intrusive. Non-routine searches have been described by the Supreme Court as strip searches, body cavity searches, or involuntary x-ray searches. *Id.* at 541, 105 S.Ct. 3304 n. 4. This list, however, is not necessarily exhaustive.

Patdown searches have also been deemed non-routine and "intrusive" when a Customs officer feels underneath of a person's clothing, particularly in the breast and crotch area. *Anderson v. Cornejo,* 199 F.R.D. 228, 258 (N.D.Ill.2000). In *Anderson,* a class action lawsuit brought against the U.S. Customs Service by a class of black women, the Court opined that "fondl[ing] a female traveler's breasts, crotch area, or buttocks, even above her clothes" is also non-routine and intrusive. *Id.* The Court stressed that by "fondle," it strictly meant to patdown in a "sexual or sexually suggestive manner." *Id.* at 259. The Court, however, distinguished fondling from "aggressively grop[ing]." *Id.* Because certain plaintiffs in *Anderson* did not allege that they were fondled, even though they alleged that their breast and crotch areas were patted down over their clothing, the Court refused to find the patdowns non-routine.

Conversely, however, another plaintiff in *Anderson* alleged that a Customs officer pushed her hand up the plaintiff's vagina six times in a painful manner causing injury. The *Anderson* Court found this allegation sufficient to support a claim that the "patdown" was intrusive. *See id.* at 260–62.

In *Saffell v. Crews,* the plaintiff was subjected to a patdown search similar, though ultimately more elevated, to the search conducted here. The plaintiff was

taken into a private room, told to lean against the wall with her legs spread, and the Customs officer moved her hands over the plaintiff's entire body, including the breast and crotch area. *Saffell v. Crews,* 183 F.3d 655, 657 (7th Cir.1999); *Saffell v. Inspector C. Crews,* 1998 WL 832653 at *1, 2–3 (N.D.Ill. Nov.20, 1998). The patdown search in *Saffell* "revealed a bulge under Saffell's clothes in the most intimate area of her body, a place where drugs are sometimes known to be secreted by women." *Saffell,* 183 F.3d at 657. A further strip search was therefore found to be justified, even though no drugs were ultimately found. *See id.* The *Saffell* Court stressed that because the "Customs Service has had experience with clever and devious smugglers including ways in which the body can be and is used to secrete narcotics," the strip search after detecting a bulge in plaintiff's crotch area was lawful. *Id.* at 658.

*Anderson* indicated that in the Seventh Circuit, a "patdown search falls somewhere between a search of luggage requiring no suspicion at all and a strip search, which requires 'reasonable suspicion.'" *Id.* at 256, 106 S.Ct. 2505. "The level of suspicion of the agent must be balanced against the level of indignity perpetrated upon the traveler." *Id.*

▮ Here, Plaintiff alleges that her patdown search was nonroutine and intrusive because Mazzarulli rubbed her hands over Plaintiff's breasts and over the "inner and outer labia of her vagina." It is uncontested that the patdown search here took place over Plaintiff's dress, and that her skin was not directly touched. Just because Mazzarulli patted in the breast and crotch area does not render the patdown an intrusive search. Courts have found that routine patdown searches typically involve a Customs officer rubbing her hands over these particular areas of the clothed body. *Anderson,* 199 F.R.D. at 258–59. The fact that Plaintiff chose not to wear underwear does not transform this patdown search into an intrusive one. It would have been reasonable for Mazzarulli to assume that Plaintiff was in fact wearing underwear, the presence of which would have created an additional barrier between Mazzarulli's hand and Plaintiff's vaginal area.

Just because Plaintiff's counsel repeatedly uses the phrase "inner and outer labia of [the] vagina" also does not transform this search into an intrusive one. *See Anderson,* 199 F.R.D. at 258. Mazzarulli rubbed her hands over that area in order to feel for bulges which might be narcotics. Customs officials have determined that the female genitalia is a common location used by drug smugglers for hiding narcotics. *See Saffell,* 183 F.3d at 657.

Defendants have submitted a diagram of the anatomy of the female reproductive system, which depicts both the internal genitalia and the external genitalia. The labia are considered part of the external genitalia. In other words, the labia are part of the outer surrounding of the vagina. The outer labia, or the labia majora is defined as "[t]wo rounded folds of tissue forming the external lateral boundaries of the vulva." Webster's II New Riverside University Dictionary (1984). The inner labia, or the labia minora is defined as "[t]wo narrow folds of tissue enclosed within the cleft of the labia majora." *Id.*

This Court finds that an officer patting down a woman's crotch area to feel for bulges, would necessarily press upon the external genitalia, including the inner [7] and

---

7. Though the term "inner" labia may give an impression that it forms part of the internal

genitalia, the definition and the diagram of the labia make clear that the inner labia,

outer labia, through one's clothing. While Plaintiff's brief in opposition to this motion states that Mazzarulli "inserted her fingers" into Plaintiff's vaginal area, the Amended Complaint alleges something a bit different. Embarrassing and semantic though it may seem, this is an important distinction. The Complaint specifically states that Mazzarulli "slowly rubbed her hands" over Plaintiff's breasts and the "inner and outer labia of her vagina." Plaintiff's affidavit phrases it a little differently, stating that Mazzarulli "push[ed]" on her breasts and "the inner and outer labia" of her vagina. Bradley Aff., ¶ 28.

Patting one down in the breast and crotch area inherently involves a rubbing or pushing motion. The anatomy of the female reproduction system is such that the labia form the outer boundaries, and are located in the particular area which would be pushed on or rubbed as part of a routine patdown search over clothing. The Court takes notice of the difference between the external genitalia and the internal genitalia. A routine patdown search would never involve penetration of a woman's internal genitalia. Penetration of the internal genitalia, absent reasonable suspicion, would in all likelihood constitute an unreasonable search. But that is not what happened here.

Additionally, there is no allegation nor indication that the touching of Plaintiff's crotch area was done in a sexual manner.[8] Plaintiff's Complaint does not so allege,

nor do Plaintiff's submissions indicate such a belief.[9]

The Court finds that Customs procedure requires a female officer to rub her hands over the very specific areas of the female body alleged by Plaintiff to have been patted down here. This is the standard procedure used in order to properly feel for bulges in an area known by Customs officials as a common place for hiding contraband. The Court does not suggest that this is a comfortable position for any woman to be in, however, given our country's great interest in protecting against the importation of illegal drugs and other contraband, it is a necessary position. *See Montoya*, 473 U.S. at 541, 105 S.Ct. 3304.

Defendants further assert that even if the search at issue here were considered intrusive or non-routine, they had the requisite reasonable suspicion to conduct a non-routine search. Defendants have articulated objective reasons why Plaintiff was initially selected for a luggage search and why she was then sent for a secondary patdown search. Unusual conduct, one's attitude, and unusual clothing of the type where contraband has previously been found are sufficient reasons for purposes of establishing reasonable suspicion. *United States v. Asbury*, 586 F.2d 973–76 (2d Cir.1978). The similar reasons articulated by Defendants here for initially selecting Plaintiff and for subsequently patting her down were "particularized and

---

despite its name, forms part of the female external genitalia.

**8.** Moreover, Plaintiff's reliance on the Ninth Circuit case of *Jordan v. Gardner* is misplaced. This case dealt not with a border search, but with a search conducted by a male prison guard upon a female prisoner where the male guard "squeezed" the prisoner's crotch area and flattened her breasts. 986 F.2d 1521, 1523 (9th Cir.1993).

**9.** Officers Mazzarulli and Castleberry do, however, state in their declarations that during the patdown, Plaintiff yelled "you're grabbing my f——ing p——y." Officer Castleberry further states that Plaintiff also yelled that the two female officers were "getting off on it." Mazzarulli Decl., ¶ 19; Castleberry Decl. of April 25, 2001, ¶ 14. Plaintiff has made no allegations in this lawsuit, however, indicating that she was "fondled" or otherwise touched in a sexual manner.

objective." Therefore, the Court finds that the Defendant Customs officers had the requisite reasonable suspicion to conduct even a non-routine search. Whether considered routine or non-routine, the totality of the circumstances justifying suspicion on the part of Customs officers, when balanced against the level of indignity to which Plaintiff was subjected, suggests that this search was not so intrusive as to violate Plaintiff's Fourth Amendment rights. As a result, Count One will be dismissed.

■ Count Three alleges invasion of privacy in violation of the Fourth, Fifth, and Ninth Amendments based on Plaintiff's claim of an unduly invasive search. Plaintiff contends that Defendants infringed her Ninth Amendment right to bodily integrity and autonomy.[10] "The Ninth Amendment provides: 'The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.'" *Osborn v. U.S.*, 385 U.S. 323, 341, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). In other words, the Ninth Amendment reserves rights for the people even though the rights are not particularized in the previous eight constitutional amendments. *See id.* The Ninth Amendment "was intended to preserve the underlying theory of the Constitutional Convention that individual rights exist independently of government, and to negate the Federalist argument that the enumeration of certain rights would imply the forfeiture of all others. The ninth is simply a rule of construction, applicable to the entire constitution." Comment, The Uncertain Renaissance of the Ninth Amendment, 33 U. Chi. L. Rev. 814, 835 (1966). Therefore, the Ninth Amendment is broad enough to protect individuals against unau-

thorized invasions of privacy. As indicated earlier, however, federal statutes authorize Customs officials to detain and search passengers arriving from foreign countries. *See* 19 U.S.C. §§ 1582, 1496; 19 C.F.R. § 162.6. The search of Plaintiff has already been determined lawful. The Court therefore finds that Plaintiff had no right to be free from the type of search which occurred here. As a result, Count Three must be dismissed.

■ Count Four asserts violations of due process protection under the Fourth and Fifth Amendments and is also based on Plaintiff's claim that she was subjected to a non-routine personal search without legal cause, and that she was held *incommunicado*. Although unclear in the Amended Complaint, Plaintiff's attorney clarifies in her brief in opposition to this motion that the claim is a procedural, not substantive, due process claim. The Supreme Court has set forth a two-step test for determining if one's procedural due process has been violated. First, there must be an allegation of sufficient constitutional magnitude, and second, the Court must look to what procedural protection is needed to adequately protect that interest. *Ingraham v. Wright*, 430 U.S. at 672–73, 97 S.Ct. 1401. It is clear, however, that if a plaintiff has no established right to a particular process, her rights to procedural due process cannot be violated. *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

Plaintiff cites to a case which indicates that Customs officials must accord travelers due process protection when those individuals are subject to non-routine searches. Pl. Br. at 30–31 (*citing United States v. McCain*, 556 F.2d 253, 255 (5th

---

**10.** Because the Court has already found that Plaintiff's Fourth Amendment rights were not violated as the search was authorized and

lawful, only the Ninth Amendment claim under Count Three will be addressed here.

Cir.1977)). Because the Court has found, however, that the search at issue here was a routine patdown search, Plaintiff's procedural due process rights cannot have been violated. As a result, Plaintiff's due process claim asserted in Count Four fails.

Assuming, *arguendo*, that Plaintiff had made out *prima facie* claims of constitutional violations against Defendants Scaringella, Mazzarulli and Castleberry, they would nevertheless be entitled to qualified immunity from this lawsuit. *See Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Brown v. Armenti*, 247 F.3d 69 (3d Cir.2001). Qualified immunity is afforded to federal employees to protect them from reasonable mistakes or poor judgment calls. *Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)(indicating that qualified immunity provides "ample room for mistaken judgments"). A federal employee is not, however, entitled to qualified immunity in instances where they knowingly violate the law or act incompetently. *Id.* "[A]s long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated," the federal officer is protected from suit by qualified immunity. *Anderson v. Creighton*, 483 U.S. at 638, 107 S.Ct. 3034. Unless a plaintiff alleges a violation of a "clearly established statutory or constitutional right of which a reasonable person would have known," a federal employee is immune from suit. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The relevant question in deciding whether qualified immunity applies is whether the Customs inspector "acted reasonably under settled law in the circumstances." *Hunter*, 502 U.S. at 228, 112 S.Ct. 534. Reasonableness is to be determined objectively. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d

271 (1986). If a reasonably well-trained officer in the defendant's situation would not have known that his or her conduct violated someone's constitutional rights, the defendant is entitled to qualified immunity, regardless of whether their conduct violated other internal guidelines, ethical principles, regulations or statutes. *Davis v. Scherer*, 468 U.S. 183, 194, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

"A right is not clearly established if officers of reasonable competence could disagree on the issue." *Id. (quoting Hinnen v. Kelly*, 992 F.2d 140, 142–43 (7th Cir.1993)). So even if an officer's conduct is later deemed unlawful, that officer is nevertheless entitled to qualified immunity if he or she made an objectively reasonable decision. Put differently, if a reasonable officer could have rationally believed that the initial luggage and subsequent patdown search here was lawful, the individual Defendants are entitled to qualified immunity. *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The question of whether a law was settled is a question of law for the Court to determine. *See Wilson v. Layne*, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Moreover, if qualified immunity is at issue, it is in the interest of judicial economy for it to be decided as early in the litigation as possible. *Saucier*, 121 S.Ct. at 2155–56. Qualified immunity is an entitlement not to stand trial, and not simply a defense to liability. *See id.* at 1256.

A Northern District of Illinois case recently held that it was not until July 6, 1999, when the opinion of *Saffell v. Crews* was published, did a standard of "some suspicion" for conducting patdown searches become established. *See Anderson v. Cornejo*, 199 F.R.D. 228, 247 (N.D.Ill.2000). The *Anderson* case indicates that in April 1999, when the patdown

of Plaintiff here took place, the law indicated that "no suspicion whatsoever" was required for a patdown search. *Id.* Similarly in the Third Circuit, prior to April 1999, there was no clear case law on what, if any, degree of suspicion was necessary for Customs officers at our international borders to conduct patdown searches. Therefore, Mazzarulli, Scaringella, or Castleberry could not have violated "clearly established" constitutional rights in searching Plaintiff on April 5, 1999. A reasonably well-trained officer in Defendants' situation would not have believed they were violating Plaintiff's constitutional rights. It cannot be found here that there was a clearly established rule that prohibited Defendants conduct on that night. The Defendants would therefore be entitled to qualified immunity.

 Plaintiff's claims against the United States and Customs Officials for supervisory liability are also not viable. This Court has previously set forth the requisite elements for supervisory liability under § 1983, which are the same for a *Bivens* action alleging claims based on supervisory liability.[11] A plaintiff must show:

(1) the [federal] officers inflicted cognizable injury on plaintiff; (2) the officers acted pursuant to a [federal] custom or policy not to adequately train or supervise; (3) there is 'a direct causal link between [the] [federal] policy or custom, and the alleged constitutional deprivation' . . . and (4) the failure to so train or supervise 'amounts to deliberate indifference to the rights of persons with whom the [officers] came into contact.'

*Rodriguez v. City of Paterson,* 1995 WL 363710 at *4 (D.N.J. June 13, 1995)(*quoting City of Canton v. Harris,* 489 U.S. 378, 385, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Doe v. Division of Youth & Family Services,* 2001 WL 708444 (D.N.J. June 25, 2001). The Third Circuit has similarly indicated that a plaintiff asserts a failure to supervise claim under § 1983 by identifying a supervisory practice which the defendant failed to employ, and by showing " 'both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval.' " *C.H. v. Oliva,* 226 F.3d 198, 202 (3d Cir.2000)(*quoting Bonenberger v. Plymouth Township,* 132 F.3d 20, 25 (3d Cir.1997)(*in turn quoting Colburn v. Upper Darby Township,* 838 F.2d 663, 673 (3d Cir.1988))).

 If an individual has suffered no constitutional injury, however, that person cannot maintain a derivative action against a supervisor, regardless of the possibility that the officials in charge may have fostered a policy of promoting unconstitutional practices. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might *authorize* use of unconstitutional action is quite beside the point"); *Rodriguez v. City of Passaic,* 730 F.Supp. 1314, 1321 (D.N.J.1990), *aff'd* 914 F.2d 244 (3d Cir. 1990); *accord Apodaca v. Rio Arriba County Sheriff's Dep't,* 905 F.2d 1445 (10th Cir.1990). Accordingly, because all of the claims against Defendants Kelly, Banks, Winwood, Bowen, Haage, and Lucania are dependent upon a constitutional injury and because such injury does not exist here, these claims are dismissed.

---

**11.** The standards applicable to § 1983 cases apply to *Bivens*-type cases as well. *Paton v.*

*LaPrade,* 524 F.2d 862, 871 (3d Cir.1975).

### 3. FTCA/ Count Five

■ Count Five is a Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, claim against the United States of America for actions taken by U.S. Customs officials in their official capacity. This count alleges that Defendants are liable for false imprisonment, assault, battery, negligent supervision, intentional infliction of emotional distress, and invasion of privacy. The FTCA allows an individual to assert a damages claim against the United States where that individual has suffered a constitutional tort at the hands of a federal official. *See Locks v. Three Unidentified Customs Service Agents*, 759 F.Supp. 1131, 1134 (E.D.Pa.1990).

Defendants contend, however, that they are subject to the discretionary function exception to the FTCA pursuant to 28 U.S.C. § 2680(a). Section 2680(a) provides for absolute immunity from suit for "acts or omissions ... based upon the exercise or performance or the failure to exercise or perform a discretionary function ... whether or not the discretion is absurd."

■ Plaintiff contends that this exception does not apply to the United States in the case at bar because the exception is only applicable where the decisions at issue were based upon public policy. *See United States v. Gaubert*, 499 U.S. 315, 323, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). The Supreme Court has set forth a two-prong test for federal courts to employ when determining whether this exception applies. *Id.* First, the act by the defendant must be discretionary in nature, involving a degree of choice and judgment. *Id.* at 322, 111 S.Ct. 1267. It has been held that decisions by Customs officers regarding whether to single out and search an individual at the border is inherently a discretionary act, i.e., the Customs officer must make a judgment call. *Jackson v. United States*, 77 F.Supp.2d 709, 714 (D.Md.1999).

The second prong requires that the defendant's act implicate considerations of public policy. *Gaubert*, 499 U.S. at 322–23, 111 S.Ct. 1267. Courts have found that border searches clearly implicate public policy in that a decision to search an individual arriving from a foreign country relates to our nation's drug problems. *Garcia v. United States*, 913 F.Supp. 905, 909, 914 (E.D.Pa.1996)(holding that discretionary function exception applies to non-routine border searches); *see also Jackson*, 77 F.Supp.2d at 714 ("Border searches ... clearly implicate broad questions of social, economic, and political policy, particularly in light of the vexing problem of drug smuggling").

■ Because this was a border search conducted by Customs officers who were using discretion and whose decisions were inherently based on public policy, this Court is convinced that the discretionary function exception to the FTCA applies to Defendants here. Therefore, The United States and the U.S. Customs Service cannot be held liable for the claims alleged by Plaintiff under the FTCA. As a result, Count Five of Plaintiff's Amended Complaint must also be dismissed with prejudice.[12]

### *CONCLUSION*

Plaintiff's annoyance, embarrassment, and even disgust with the Defendant Cus-

---

12. Notably, all of Plaintiff's tort claims are premised on Plaintiff's allegation that Custom's officers had no right to conduct the patdown search that took place here or to detain Plaintiff on April 5, 1999. Because the Court has found otherwise, and because federal statutory law states that Plaintiff was indeed subject to a patdown search and detainment at our international borders, Plaintiff's tort claims of false imprisonment, assault and battery, negligent supervision, intentional

toms Officers is entirely understandable. The Court would imagine that any person who is subjected to a patdown search (considering that a complete stranger rubs their hands all over your body, including the most intimate of areas) would feel the same way. This is especially understandable where the person being searched and patted down is a wholly law abiding citizen, as Plaintiff is here. These feelings, as strong and understandable as they may be, are simply not enough to hold a federal employee personally liable for performing their job.

### ORDER

Based on the foregoing analysis, Defendants' motion for summary judgment is **GRANTED** in its entirety. Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE** and this case is now **CLOSED**.

**SO ORDERED.**

infliction of emotional distress, and invasion of privacy would fail anyway.