**Patricia L. HURN, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**No. CIV.A. 99–2385.**

United States District Court, D. New Jersey.

Sept. 4, 2002.

David L. Harris, Lowenstein Sandler PC, Roseland, NJ, Meldon Jenkins–Jones, Newark, NJ, for Plaintiff.

Robert Andrew Kirsch, Assistant United States Attorney, Newark, NJ, for Defendants.

## OPINION

CAVANAUGH, District Judge.

Before the Court in this *Bivens* matter are Plaintiff Patricia L. Hurn and Defendants United States of America, United States Department of Treasury, U.S. Customs Service, Raymond Kelly as Commissioner of the United States Customs Service, and other fictional agents inspectors and supervisors of the U.S. Customs Service. Plaintiff alleges that Defendants subjected her to improper search upon returning from a trip to Jamaica that violated her right to: (1) Equal Protection under the Fifth and Fourteenth Amendments; (2) be free from illegal searches and seizures under the Fourth Amendment; (3) Privacy under the Fourth, Fifth and Ninth Amendments and; (4) Due Process under the Fourth and Fifth Amendments. Plaintiff also asserts that she was intentionally subjected to tortious conduct cognizable under the Federal Tort Claims Act ("FTCA"). Presently before the Court are Plaintiff's motion for reconsideration of this Court's Order denying leave to file a Third Amended Complaint and the Government's motion for summary judgment.

## BACKGROUND

Plaintiff is a 35 year-old, African–American woman, who resides in Cleveland, Ohio. Defendant United States of America's Statement in Compliance with Rule 56.1 ("56.1 Statement"), ¶ 1. Prior to the alleged incident, Plaintiff made several trips to Canada and Jamaica to gamble.

In April of 1996, Plaintiff first traveled to Jamaica. 56.1 Statement, ¶ 2. Plaintiff traveled alone and stayed at a resort for approximately ten or eleven days. Upon her return to the United States, she was stopped by Customs briefly, presented her identification, and proceeded through without incident. 56.1 Statement, ¶ 3. In November of 1996, Plaintiff planned another trip to Jamaica and purchased her airline ticket from Continental Airlines. 56.1 Statement, ¶ 4. Plaintiff did not take this November of 1996 trip to Jamaica. 56.1 Statement, ¶ 4.

In May of 1997, Plaintiff traveled to Jamaica, again alone, for another ten-day vacation. 56.1 Statement, ¶ 5. Plaintiff's stated purpose for the trip was to visit her then boyfriend, Michael Reid, who she met during her April 1996 trip to Montego Bay, Jamaica. 56.1 Statement, ¶ 5. During this trip, Plaintiff stayed at a resort. 56.1 Statement, ¶ 6. Plaintiff spent about $100 a day, in cash, for a total of approximately $1,000. Deposition of Patricia Hurn ("Plaintiff's Dep."), T88:12–25.

On May 25, 1997, after landing at Newark Airport at approximately 5:30 p.m., Plaintiff proceeded to the baggage terminal to claim her luggage (two suitcases). 56.1 Statement, ¶ 7. Thereafter, Plaintiff approached the Customs Inspection site, where she was met by a "male" "caucasian" Customs official. 56.1 Statement, ¶ 8. At that time, Plaintiff weighed approximately 165 pounds, and was wearing a "loose fitting" "button up" "long-sleeved rayon blouse" and dress slacks. Plaintiff's Dep., T104:18–19, 24–25, 105:4–11. At the request of the Customs Official, Plaintiff presented her credentials and traveling papers. Plaintiff's traveling papers clearly indicated that the tickets for this May 1997 trip were purchased, at least in part, in "cash." 56.1 Statement, ¶ 10; Plaintiff's Dep. T81:1–7; T82:20–25. Plaintiff redeemed her unused airline ticket from No-

vember 1996 trip to pay for her May 1997 trip.

Plaintiff did not present a Passport to the Customs official, but instead presented her Ohio driver license, Social Security Card, Voter Registration Certificate, and birth certificate. Plaintiff's Dep., T101:1–9; T95:16–20; Declaration of Robert Kirsch ("Kirsch Decl."), Ex. 1–2, 4–6. In fact, Plaintiff has never owned a Passport. Plaintiff's Dep., T6:17–18; T54:23–25; T55:1–2. Each identification yielded consistent information.

A "Subject Record" maintained in the Treasury Enforcement Communication System ["TECS"] indicated that Patricia Hurn was under an active investigation by the Secret Service as a "suspect" for credit card fraud. 56.1 Statement, ¶ 13. TECS is a national database used by Customs and other law enforcement agencies that contains information on suspect individuals, criminal investigations, and criminal histories. 56.1 Statement, ¶ 13. This TECS record listed Plaintiff's name and identified Plaintiff's proper date of birth and social security number. 56.1 Statement, ¶ 13. This record was viewed by Pat Orender, the "unknown" male Customs official who detained and questioned Plaintiff prior to her patdown and strip search. 56.1 Statement, ¶ 13.

The Declaration of Ronald M. Loveitt indicates that Patrick Orender accessed this TECS record at 18:13 (6:13 p.m.), prior to Plaintiff's referral to the female Inspectors for Plaintiff's search. 56.1 Statement, ¶ 13. Another Customs' document, which was prepared within minutes of the subject detention and search, indicates that the personal search at issue occurred between 18:20 and 18:25 (6:20–6:25 p.m.). 56.1 Statement, ¶ 13.

Plaintiff recalled that this male Customs official asked her where she worked, and that she responded that she worked at a

company called "Accounts Temp." Plaintiff's Dep., T103:1–4. Accounts Temp. is a "temporary" agency where Plaintiff worked intermittently from 1997 until 1998. Plaintiff's Dep., T21:6–21. Plaintiff also recalled other routine questions regarding who packed her luggage and whether she made any purchases in Jamaica. Plaintiff represented that she packed all of her own luggage. Plaintiff's Dep., T102:18–22. Plaintiff does not recall any other questions asked of her. Plaintiff's Dep., T104:3–5.

While asking Plaintiff questions, the Inspector proceeded to examine the contents of Plaintiff's luggage in her presence, which took "about five to ten minutes." Plaintiff's Dep., T111:24–25; T112:9–10; T113:13–114:8. Plaintiff testified that the male official was initially respectful, courteous, and polite to her, but that she "detect[ed] a little anger or nastiness in his voice" after attempting to grab her undergarments during the search. Plaintiff's Dep., T114:15–21; T107:11–108:3; T108:13–17. Plaintiff was admittedly annoyed at this point and when asked if she expressed her displeasure verbally to the Inspector, Plaintiff testified "probably so." Plaintiff's Dep., T115:4–13.

All of Plaintiff's interactions with the male official were conducted in a public, "open" area. Plaintiff's Dep., T127:13–19. The official did not utter any racial or gender based statements to Plaintiff during their interaction. Plaintiff's Dep., T120:18–121:4. After examining Plaintiff's bags, the official advised Plaintiff to wait in the same open area where he searched Plaintiff's bag. Plaintiff's Dep., T120:2–17, T127:19. A few minutes later, the male Customs official returned with two female Customs Inspectors. Plaintiff's Dep., T117:3, T119:15–19. The male official then advised Plaintiff that she would have to be further searched. Plaintiff's Dep., T119:23–120:1. Plaintiff admitted she was annoyed and irritated at the prospect of being searched, and she expressed "reactions" of "concern and fear." Plaintiff's Dep., T126:8–21.

### Customs' Search of Plaintiff

Regarding the two female Inspectors, Plaintiff testified that "one may have been Caucasian and one was foreign[,]" having the appearance of being an "immigrant." Plaintiff's Dep., T122:1–2, 22–25. The two female Customs Inspectors then accompanied Plaintiff to a private, "average[d sized] room," with no windows. Plaintiff's Dep., T129:11–22; T132:14–22. The male official was not present, and the two female Inspectors, and Plaintiff, were the only individuals in the room, with the door closed shut behind them. Plaintiff's Dep., T132:8–13, T132:17–22.

Once in the room, one of the female Inspectors again advised Plaintiff that they were going to search her. Plaintiff's Dep., T130:19–P.131:7. The female Inspectors spoke in an "average" and respectful tone and neither Inspector used profanity or racial references at any time. Plaintiff's Dep., T131:13–22; Plaintiff's Dep., T131:23–P. 132:3.

One of the female Inspectors then proceeded to perform a pat down of Plaintiff, who was fully clothed, by manually inspecting the contours of Plaintiff's body through her outer clothing. Plaintiff's Dep., T137:1, 7. During the pat down, the Inspector did not physically touch any part of Plaintiff's skin or body, except through Plaintiff's clothing. The pat down consisted of an examination up and down Plaintiff's legs to her feet, the stomach area, groin area, and her breasts, although she cannot recall the order of the examination. Plaintiff testified that the Inspector "fondled" her breasts and groin. When asked what she meant by her use of the word "fondled," Plaintiff responded: "[p]ressed on it." Plaintiff's Dep., T137:13–15. The

entire pat down took only "[a] few minutes." Plaintiff's Dep., 151:12–17.

The other female Inspector observed the patdown. Plaintiff's Dep., T136:2–8. Neither of the Inspectors spoke to her, or each other, and Plaintiff did not say anything to the Inspectors, during the pat down. Plaintiff's Dep., T137:16–25; T144:15–18. After the patdown, both female Inspectors left the room. Plaintiff's Dep., T138:18–24.

A few minutes later, the same two female Inspectors returned and again closed the door for privacy. Plaintiff's Dep., T139:6–T140:7; T140:21–24. One of the Inspectors then advised Plaintiff that a further search of Plaintiff's person was necessary. Plaintiff's Dep., T140:9–10. Again, Plaintiff described the Inspector's demeanor and tone of voice as average and respectful. Plaintiff's Dep., T141:4–25. Plaintiff did not ask either of the Inspectors why they felt an additional search was necessary, even though the additional search made her concerned about her ability to catch her connecting flight. Plaintiff's Dep., T140:13–20.

After telling Plaintiff that they were going to have to perform an additional search, one of the Inspectors asked Plaintiff to remove her shirt. Plaintiff's Dep., T142:2–6. Plaintiff was not wearing a bra, but nonetheless, Plaintiff complied and removed her blouse for examination. Plaintiff's Dep., T142:7–18. Plaintiff was then asked to remove her pants for inspection, which she did. Plaintiff's Dep., T143:5–6; T147:10–12, 23–4. After the Inspector examined Plaintiff's pants, she asked Plaintiff to remove her undergarment. Plaintiff's Dep., T147:13–22; T148:1–3. Plaintiff, without objection, removed her undergarment, and was thus forced to await the inspection of her garments in the nude, albeit within a closed and private room. Plaintiff's Dep., T142:22–143:4; T149:1–4, 19–24. Plaintiff

admitted "that she was wearing a pantiliner in her underwear," and upon removal of her underwear, displayed the "inside of the lining of the pantiliner to the Inspectors." Second Amended Compl., ¶ 19.

After inspecting Plaintiff's garments, one of the female Inspectors then asked Plaintiff to bend down and touch her toes. Plaintiff's Dep., T150:1, 12–14. Plaintiff describes that she was then asked to spread her buttocks to permit the Inspectors to conduct a "visual rectal inspection." Plaintiff's Rule 56.1 Counterstatement of Material Disputed Facts, ¶ 16; Plaintiff's Dep., T153:14. This inspection apparently took place for about a minute. Plaintiff's Dep., T153:20–25. At no time during this search did the Inspector ever touch Plaintiff. Plaintiff's Dep., T152:16–18. Immediately thereafter, one of the Inspectors advised Plaintiff that she could get dressed. Plaintiff's Dep., T154:1–3. Both Inspectors, then, briefly left the room again and returned a couple minutes later. Plaintiff's Dep., T154:5–12. One of the Inspectors then advised Plaintiff that she was free to go. Plaintiff's Dep., T154:13–15.

Plaintiff testified that she then asked the Inspectors why she was searched. Plaintiff's Dep., T155:8–9. Although Plaintiff is unaware which female Inspector responded, one of them told her it was because Plaintiff was traveling alone. Plaintiff's Dep., T155:12–18. In an admittedly angry, sarcastic tone of voice, Plaintiff responded, "you all must love your job." Plaintiff's Dep., T156:6–17. Plaintiff left the room and found her two bags as she left them. Plaintiff's Dep., T157:5–15. Plaintiff then proceeded to check her luggage for her connecting flight from Newark to Cleveland, which departed later that night. Plaintiff's Dep., T158:2–8.

### Customs Documentation for Subject Search

After Plaintiff was searched, Patrick Orender prepared a TECS II–Incident Log memorializing that a search was conducted on Plaintiff. The basis for the search, as set forth on the Negative Search Details portion of the Log, include the fact that Plaintiff was traveling from a narcotics source country; that she appeared "very nervous;" that she was wearing "bulky clothing," and that she was traveling without a passport. Furthermore, the Log confirms the brevity of the intrusion by recording that the search started at 6:20 p.m. and was completed by 6:25 p.m.

### Subsequent International Trips

In June, 1998, the year after the subject search at issue, Plaintiff traveled again to Jamaica. Plaintiff's Dep., T60:4–8. On this trip, Plaintiff traveled to and from Jamaica alone. Plaintiff's Dep., T60:9–11; T67:1–8. Plaintiff married Mr. Reid on this trip, who still lived in Jamaica at the time. Plaintiff's Dep., T60:12–18; T67:6–15. Upon her return, she proceeded to U.S. Customs where she was questioned briefly, and passed through uneventfully. Plaintiff's Dep., T69:2–19.

In 1998, Plaintiff took another trip to Canada to gamble. Plaintiff's Dep., T70:23–71:10. Plaintiff was traveling alone, driving another person's vehicle. Plaintiff's Dep., T72:8–9, 23–4. Upon entering Canada, Plaintiff was stopped by Canadian Customs officials, who questioned Plaintiff, but eventually permitted Plaintiff to continue into Canada. Plaintiff's Dep., T71:19–76:22; T72:5–17; T73:2–3; Plaintiff's Dep., T76:12–13.

### Damages

On October 1, 1998, more than sixteen (16) months after the search at issue by U.S. Customs, Plaintiff filed an administrative claim seeking $200,000 in damages. However, Plaintiff went to work the next day and admitted that this incident caused her to lose no time from work. Plaintiff's Dep., T169:7–9. When "assignments faded out," Plaintiff became unemployed from Accounts Temp. and collected unemployment payments for a six-month period in 1998–99. Plaintiff's Dep., T25:5–19. This was not the first time Plaintiff had collected unemployment compensation. See Plaintiff's Dep., T26:2–16.

Plaintiff claims that her damages are based on humiliation, demoralization, degradation, inhumane treatment, and emotional distress resulting from the subject search, which was conducted in private by two (2) female Customs Inspectors. Plaintiff alleged that her severe emotional distress has been manifested by, among other general complaints, depression, weight gain, decreased sexual desire, fear of flying and a fear of traveling internationally.

### Depression

With regard to her allegation that she has become depressed as a result of the five (5) minute search, which was conducted in private and well over three (3) years ago, Defendant makes the following observations. First, Plaintiff has failed to submit any expert report attributing any mental illness diagnosis to this incident. Second, Defendant notes that the subject search occurred on May 25, 1997, but her first (and only) visit to Dr. John Vitkus did not occur until September 17, 1999—well more than two years after the incident, and well after the retention of counsel and commencement of this lawsuit, not to mention her unemployment, marriage and other commonly accepted stress factors. Dr. Vitkus did not see Plaintiff after this one meeting. Plaintiff also had one (1) consultation with Trudy Helge, who Plaintiff described as a "therapist," on January 7, 2000. Plaintiff Dep., T180:3–4. Neither medical practitioner prescribed any medication.

### Weight Gain

Plaintiff also alleges the subject incident of May 25, 1997 has caused her to gain weight. According to Plaintiff's Ohio Driver License, issued on June 21, 1993, Plaintiff's listed weight was 104 pounds. Plaintiff admits that her weight on May 25, 1997, was "about 165 [pounds] or so." Plaintiff's Dep., T54:6–8. At her recent deposition, on July 25, 2000, Plaintiff stated that her present weight is "[a]bout 200 pounds." Plaintiff's Dep., T53:11–12. According to Plaintiff, she has gained approximately thirty-five (35) pounds since the subject search, and because of the subject search. Plaintiff's Dep., T54:9–11.

Plaintiff, however, had been gaining significant weight for several years prior to the incident. For example, from June 1993 until May 1997, the immediate four years prior to the search at issue, Plaintiff gained over sixty (60) pounds. In the approximately three years since the search at issue, as stated above, Plaintiff gained another thirty-five (35) pounds. Thus, the underlying cause of Plaintiff's weight gain largely predates the incident at issue.

### Decreased Sexual Interest

Plaintiff claims the search has resulted in her decreased desire for sexual relations. Plaintiff's Dep., T174:5–7. Plaintiff testified to the following: "I don't want to be touched half of the time. I don't even have the desire to involve in sex half the time." Plaintiff's Dep., T172:21–173:4. Plaintiff admitted that no medical practitioner advised her that her reduced sexual interest relates to the May 1997 incident. Plaintiff's Dep., T173:18–21. Furthermore, Plaintiff married Mr. Reid in June 1998 and begin living with Mr. Reid in November 1999—well more than a year after the May 1997 incident. See Plaintiff Dep., T8:17–24; T9:5–6. Plaintiff admitted that she had sexual relations with Mr. Reid after the May 1997 incident and be-

fore her marriage in November, 1998. Plaintiff's Dep., T173:8–11.

### Fear of Flying

Plaintiff claims that her experience at Customs in May, 1997 has made her fearful of flying, in general, and also fearful of "traveling internationally." First, with regard to both the general "fear of flight" allegation and the specific "fear of travel internationally," Plaintiff traveled alone to Jamaica, the very next year, and returned to the U.S., again alone, in November, 1998. Plaintiff's Dep., T60:9–11; T67:1–8.

Defendant cites Plaintiff's testimony where Plaintiff admitted to repeated trips to Canada to gamble *after* the May, 1997 incident. Plaintiff testified at length regarding one of Canadian trips, in 1998. Specifically, at that time, Plaintiff, who was traveling alone, was stopped by Canadian Customs who searched her belongings. The inquiry led to a search of her vehicle and of Plaintiff's belongings. Plaintiff's Dep., T70:23; T72:5–17; T73:20–T74:18; T75:19; T76:12–13. Notwithstanding, she went on another gambling trip to Canada in 2000. Plaintiff's Dep., T63:7–11.

## DISCUSSION

### I. Summary Judgment Standard.

Summary judgment eliminates unfounded claims without recourse to a costly and lengthy trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). The burden of showing that no genuine issue of material fact ex-

ists rests initially on the moving party. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A litigant may discharge this burden by exposing "the absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. However, this effort requires more than "simply show[ing] that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion a court must view all evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587, 106 S.Ct. 1348; *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) (*citing Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.1998)); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976). The Court's role is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue of fact for trial." *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Abraham*, 183 F.3d at 287.

Once the moving party has made a properly supported motion for summary judgment, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law determines which facts are material. *Id.* at 248, 106 S.Ct. 2505. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* No issue for trial exists unless the non-moving party can demonstrate sufficient evidence favoring it, such that a reasonable jury could return a verdict in that party's favor. *See id.* at 249, 106 S.Ct. 2505.

## II. *Equal Protection.*

■ Plaintiff claims that her right to Equal Protection under the Fifth and Fourteenth Amendments was violated by U.S. Customs officials' alleged practice of racial profiling, particularly the targeting of black women for non-routine, invasive personal searches. *See* Second Amended Complaint, ¶ 51. To sustain an Equal Protection claim, Plaintiff must show that the actions of U.S. Customs officials had a discriminatory effect and were motivated by a discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990). To show discriminatory effect, Plaintiff must demonstrate that she is a member of a protected class and that similarly situated members of an unprotected class were treated dissimilarly. Plaintiff must then demonstrate discriminatory purpose, which requires a showing that U.S. Customs officials targeted her *because* of race. *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Personnel Administrator v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

If this showing can be made, the burden shifts to the Government to articulate a legitimate, nondiscriminatory reason for treating Plaintiff differently than other similarly situated individuals. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the Government can articulate such reasons, the burden shifts back to Plaintiff, who must show that the Government's proffered reason is merely pretextual. Plaintiff must show the Government's reasoning to be mere pretext to state a viable equal protection claim.

■ Plaintiff falls within a protected class because she is an African American

female. To show discriminatory effect, Plaintiff relies solely on statistical data that indicates that African American women are subjected to nonroutine searches more often than others. Statistical data, by itself, can support an inference of discrimination, but must be coupled with additional evidence to permit a finding a discriminatory intent. *See Bradley v. United States,* 164 F.Supp.2d 437, 446 (D.N.J.2001). Here, Plaintiff has presented statistics that show that African American women are subjected to nonroutine searches by Customs more often than women of other races. *See* Second Amended Compl., 41, Certification of Alix Ruben, Ex. 7, 56.1 Counterstatement, ¶ 18. This Court finds that on summary judgment, this showing is sufficient to show discriminatory effect.

█ Despite these statistics however, a factual dispute must also exist with regard to discriminatory purpose to surpass the summary judgment threshold. Here, Plaintiff has not convinced this Court that a factual dispute exists as to whether the Customs officials' actions were motivated by race. The record reflects that Customs officials searched Plaintiff because she was traveling alone and without a passport, wearing loose-fitting clothing, and was returning from a drug source country. The record also reflects that Plaintiff was under investigation for credit card fraud. While this information was obtained about seven minutes prior to the search of Plaintiff, the record supports the conclusion that this information was available prior to Plaintiff's strip search, which indicates that Plaintiff was not set aside for search because of her race, but rather, because of a totality of legitimate, nondiscriminatory reasons. Accordingly, this Court finds, as a matter of law, that U.S. Customs officials did not subject Plaintiff to a search with a discriminatory purpose and as a result, Plaintiff's equal protection claim should be dismissed.

### III. *Fourth Amendment.*

The second count of Plaintiff's complaint asserts that the search conducted by U.S. Customs amounted to an unreasonable search in violation of the search and seizure clause of the Fourth Amendment. Second Amended Compl., ¶¶ 54–56.

█ The Fourth Amendment of the United States Constitution reads:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. To determine if the Fourth Amendment applies, some form of government conduct must constitute a search that intrudes upon an individual's reasonable expectation of privacy. *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). This necessarily involves the balancing of an individual's privacy expectations against the Government's interests in conducting a particular search. *United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). In the context of border searches, the law that is binding upon this Court is very well settled. Immigration checkpoints in our Nation's airports are the functional equivalent of national borders, and as such, U.S. Customs' officials can conduct routine searches upon all individuals as a matter of constitutional right. *See Almeida–Sanchez v. United States,* 413 U.S. 266, 272–73, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Caminos,* 770 F.2d 361, 364 (3d Cir.1985). Routine border searches, which include searches of

luggage and Terry-style pat down searches, are presumed to be reasonable. *United States v. Ramsey,* 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); *Bradley v. United States,* 299 F.3d 197, 201–02 (3d Cir.2002). The Supreme Court aptly describes the reasoning behind this policy in *Montoya de Hernandez:*

> Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.

*United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (*citing Ramsey,* 431 U.S. at 616–17, 97 S.Ct. 1972).

However, in *Montoya de Hernandez,* the Supreme Court held that a body cavity search was not routine and as such, must be justified by reasonable suspicion, which requires " 'a particularized and objective basis for suspecting the particular person' of smuggling contraband." *Bradley,* 299 F.3d at 201–02 (*citing Montoya de Hernandez,* 473 U.S. at 538, 541, 105 S.Ct. 3304). A pat down search is also considered routine. *Bradley,* at 203. However, the Third Circuit in *Bradley* left open the possibility that a pat down search "could become so intrusive as to become a non-routine search requiring application of the reasonable suspicion standard." *Bradley,* at 203.

The Third Circuit case of *Bradley v. United States* is substantially similar to the present case and as such, deserves specific mention. Like Hurn, the plaintiff in *Bradley* was an African American female who was returning from a trip to Jamaica through Newark International Airport. U.S. Customs officials stopped Bradley for a combination of reasons, including the fact that she was returning from a source country for narcotics, she was wearing bulky clothing, she was wearing an unusual hat that had been used in the past for hiding drugs, and that Ms. Bradley was hostile and belligerent upon being selected for search. *Bradley v. United States,* 164 F.Supp.2d 437, 446 (D.N.J.2001). Ms. Bradley was subjected to pat down search. The District Court dismissed her case as a matter of law, holding that "[g]iven our country's great interest in protecting against the importation of illegal drugs and other contraband," it is necessary to permit routine pat down searches to include the touching of sensitive areas of the body where illegal drugs may be secreted. *Bradley v. United States,* 164 F.Supp.2d 437, 446 (D.N.J. 2001). On appeal, the Third Circuit affirmed this decision, finding the search of Bradley to be "well within the bounds of law." *Bradley,* at 200.

 *Bradley* is binding precedent and instructive on the issues before this Court. However, it must be noted that in the present case, Plaintiff Hurn was subjected to a procedure not endured by Ms. Bradley; a strip search. While the Third Circuit did not specifically address strip searches at the border, the Third Circuit in Bradley, as well as the Supreme Court in *Montoya de Hernandez,* have both held that non-routine border searches must be based on reasonable suspicion. Accordingly, this Court specifically holds that a strip search is a non-routine search that must be justified by reasonable suspicion to survive Fourth Amendment scrutiny. This holding does not break new ground. *See United States v. Diaz,* 503 F.2d 1025, 1027 (3d Cir.1974); *United States v. Lamela,* 942 F.2d 100 (1st Cir.1991). Reasonable suspicion is assessed considering the totality of the circumstances as opposed to any one particular factor in isolation. *See*

*Montoya de Hernandez,* 473 U.S. at 541, 105 S.Ct. 3304; *Diaz,* 503 F.2d at 1026.

■ Here, the record reveals that Plaintiff was subjected to a baggage search and a pat down behind closed doors. During this patdown, the Custom's official manually inspected Plaintiff's entire body above her clothing, never once touching Plaintiff's skin. Plaintiff's Dep., T137:1–7. During this patdown, Plaintiff's breasts and groin area were "pressed." Plaintiff's Dep., T137:13–15. As uncomfortable as this experience must have been for Plaintiff, this portion of her experience did not pass the threshold of routine Customs procedure and as such, was well within the bounds of the law.

However, after having conducted a patdown search of Plaintiff, Customs officials determined that a more intrusive strip search was necessary. During this strip search, Plaintiff was asked to remove her clothing for inspection and was eventually asked to bend down and touch her toes so as to permit a visual rectal inspection. Plaintiff concedes that she was never physically touched during this search.

■ As described above, Customs officials are permitted to routinely search Plaintiff as a matter of right upon her arrival from Jamaica. However, to conduct a nonroutine strip search, "a particularized and objective basis for suspecting" Plaintiff of smuggling drugs was necessary. *See Bradley,* at 201–02 (*citing Montoya de Hernandez,* 473 U.S. at 538, 541, 105 S.Ct. 3304). Upon Plaintiff's arrival from Jamaica, Customs officials were aware of the following information:

- Plaintiff was traveling from Jamaica, a known drug source country, alone and without a Passport.
- TECS records, which were accessed by Customs Official Orender prior to the strip search, indicated that Plaintiff was a suspect in an active investigation by the Secret Service for credit card fraud, and that she had traveled internationally within the prior three months.
- Plaintiff also admitted that she had taken and/or planned repeated, prior trips to Jamaica.
- Plaintiff also admitted telling Orender that she worked at a temporary agency, but was nonetheless able to afford a 10–day trip to a resort in Jamaica where she spent approximately $100 per day.
- Plaintiff admits to paying for at least part of her plane ticket in cash.
- The Customs Officials noted that plaintiff was apparently nervous and wearing loose fitting clothing.

These facts, considered in the totality, provide a sufficient basis upon which Customs officials could reasonably have suspected Plaintiff of wrongdoing. None of the above factors, considered in isolation, could sustain a finding of reasonable suspicion. But, when considered in the totality, Customs officials were presented with a profile in Plaintiff's circumstance that warranted further investigation. This does not in any way lessen the obvious discomfort Plaintiff surely experienced while being searched, especially in light of the fact that Plaintiff was guilty of no wrongdoing. But Customs officials are entitled to broad discretion to search persons entering the United States to prevent the importation of contraband. In addition, it is improper for this Court to subject the actions of Customs officials to "unreasonable second-guessing." *Montoya de Hernandez,* 473 U.S. at 542, 105 S.Ct. 3304 (*citing United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985)). As described by the Supreme Court, the "utilization of alimentary canal smuggling" of narcotics is a frequently utilized method that is very difficult to detect. Id. at 539, 105 S.Ct. 3304. To counter this deceptive

importation method, a Customs inspector is entitled to make a "common sense" assessment of a person's behavior taking into account various circumstances that may suggest a need for further investigation. *Id.* at 542, 105 S.Ct. 3304. Here, Customs officials had sufficient information to reasonably suspect Plaintiff of wrongdoing. Accordingly, this Court holds that the search of Plaintiff's baggage and the patdown were proper searches as a matter of law. Furthermore, this Court finds, also as a matter of law, that Customs officials had reasonable suspicion to conduct a non-routine strip search of Plaintiff.

## IV. *Invasion of Privacy, Due Process, Federal Tort Claims Act.*

Because this Court has found that Customs officials acted with reasonable suspicion and without a discriminatory animus, this Court finds that Plaintiff's claims under the Federal Tort Claims Act, as well as her constitutional claims of invasion of privacy and procedural due process, are dismissed as a matter of law.

## V. Motion for Reconsideration.

The Court notes that Plaintiff has moved to have this Court reconsider it's June 13, 2002 Order denying leave to amend. This Court denies Plaintiff's motion.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for reconsideration is **denied** and the Government's motion for summary judgment is **granted**. This matter is **closed**. An Order accompanies this Opinion.