**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**March 30, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

JORGE MADROZA-ACOSTA and
PEDRO DELGADO,

      Defendants - Appellees.

No. 06-2111
(D.C. No. CR-05-2602-MCA)
(D.N.M.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**HARTZ**, Circuit Judge.

The government appeals a district court order granting Jorge Madroza-
Acosta and Pedro Delgado-Fundora's joint motion to suppress evidence. Police
Officer Sean Healy, a New Mexico state patrolman, initiated a stop of a vehicle
occupied by the two men based on information provided to a police dispatcher by
an identified informant, Gary Burns. We conclude that it was not clearly

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

erroneous for the district court to find that Burns did not provide adequate and specific information to the dispatcher about why he suspected the van was engaged in illegal activity. Based on the limited information the district court found Burns' provided to the dispatcher, we conclude that Healy did not have reasonable suspicion to stop the van. Exercising jurisdiction pursuant to 18 U.S.C. § 3731, we **AFFIRM**.

## I

On November 1, 2005, Gary Burns was traveling west on Interstate 40 ("I-40"), en route to his home in Phoenix, Arizona. He stopped at a convenience store near mile marker 267, where he noticed what he described as an unusual vehicle, a "white, one-ton van with blacked-out windows." When he entered the store, Burns observed numerous "Hispanic-looking" individuals that "appeared to be a concentrated group." After he left the store and returned to his car, he watched those individuals – Burns counted approximately 18 or 19 people – enter the suspicious-looking van. Initially, Burns wrote down the van's license plate number and a brief description of the vehicle's characteristics. After further reflection, he attempted to contact the Border Patrol due to his suspicions that the individuals he saw enter the van were undocumented aliens.

Burns was unable to reach that agency, but was able to successfully contact the New Mexico State Police. Police dispatcher Annissa Ray, a trainee, spoke directly with Burns. A recording of that conversation – which is incomplete due

2

to faulty police recording equipment – reveals that Burns identified himself as "Gary," wanted to report "a lot of illegals [sic] traveling down the highway," told Ray his location, noted that 18 or 19 people were in an overloaded van, and informed Ray that he "had the tag number and everything." Because Ray was a trainee she was not able to input this information into the police computer system. Ray relayed the information Burns supplied to Carmen Leyba, her supervisor, who prepared a "computer aided dispatch" ("CAD") regarding the incident. The CAD report shows that a call was received from a Gary Burns on November 1, 2005 at 12:46 p.m. It identifies his contact number, the activity being reported as "UAD" (or "undocumented aliens"), notes the activity was observed on I-40 near mile marker 267, and indicates that the suspect vehicle, described as a white Chevrolet van with California license plate number 5NVBY479, was last seen traveling west on I-40.

Based upon Burns' tip, Leyba contacted New Mexico State Police Officer Sean Healy, who was stationed in Edgewood, New Mexico. Leyba told Healy that a tipster had observed an unusual number of people enter a white van with California license plates near mile marker 267, and that the van was heading west on I-40. Healy began heading east on I-40 in an effort to intercept the vehicle. While en route, he received additional information that the van had dark-tinted windows, displayed California license plate number 5NVBY479, and was registered to an individual named Juan Perez.

3

On I-40, near Moriarty, New Mexico, Healy spotted a white van with dark-tinted windows heading west. After turning around, Healy began following the van, but did not engage his emergency lights. Healy testified that the driver looked back at him twice, but noted that this did not qualify as unusual. The van was not speeding or being driven erratically. After Healy trailed the van for approximately four miles, the van properly signaled and exited the highway. Healy followed. When the van entered a truck stop, Healy signaled for the van to stop.

Healy approached the driver, and requested identification from both the driver and front-seat passenger. Because of the nature of the suspected criminal activity, Healy requested back-up assistance. After another police vehicle arrived, Healy asked for documentation from the van's other passengers. None were able to comply. Healy then asked the driver and front-seat passenger about their travel plans. Both stated that they were traveling from Houston, Texas to Los Angeles, California. Although it is unclear exactly when, Healy instructed dispatch to contact the Border Patrol, and shortly thereafter two agents arrived. When those agents confirmed that the van's passengers were undocumented aliens, the agents arrested the entire group.

Both the driver and the front-seat passenger, defendants Madroza-Acosta and Delgado-Fundora, were charged with one count of conspiracy to transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and four counts of

4

transporting or aiding and abetting the transport of illegal aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), 1324(a)(1)(B)(I), and 1324(a)(1)(A)(v)(II). On January 11, 2006 Madroza-Acosta filed a motion to suppress all evidence relating to the seizure and subsequent search of the van. He argued that Healy lacked probable cause or reasonable suspicion to initiate the traffic stop under Terry v. Ohio, 392 U.S. 1 (1968). Delgado-Fundora joined that motion. On March 10, 2006 the district court granted defendants' joint motion. The government now appeals.

## II

"In reviewing an order granting a motion to suppress, we accept the district court's factual findings unless clearly erroneous . . . and view the evidence in the light most favorable to the prevailing party." United States v. Holt, 264 F.3d 1215, 1228 (10th Cir. 2001) (en banc). We review the ultimate question of whether the officer had reasonable suspicion to stop the vehicle de novo. Ornelas v. United States, 517 U.S. 690, 699 (1996).

Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S 266, 274 (2002). Rather, "reasonable suspicion represents a minimum level of objective justification." United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997) (quotation omitted). Whether an officer has reasonable suspicion to initiate a stop is "not

5

readily, or even usefully, reduced to a neat set of legal rules." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quotation omitted), and is a determination that requires us to apply a "common sense" approach, United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001). Its existence "is dependent upon both the content of information possessed by police and its degree of reliability. Both factors – quantity and quality – are considered in the 'totality of the circumstances – the whole picture.'" Alabama v. White, 496 U.S. 325, 330 (1990) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)). The central question is whether "[b]ased upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).

The government does not argue that the border patrol agents had probable cause to arrest the defendants absent the information obtained by Healy. Moreover, the government concedes that the only basis for Healy's stop of the vehicle is the information Burns provided to the dispatcher.[1] Thus, based on the

---

[1] The government argued below that Healy had reasonable suspicion to stop the van and detain its occupants because of his independent knowledge and experience. It cited the following factors independent of Burns' information purportedly in support of Healy's stop of the vehicle: (1) Healy is aware that I-40 is a major smuggling thoroughfare for illegal aliens; (2) The driver of the van glanced at Healy in the side view mirror; (3) The van had blacked-out windows; (4) The van exited the freeway once Healy began following it; and (5) Healy
(continued...)

6

Supreme Court's decision in <u>White</u>, our inquiry in this case is two-fold: (1) What

[1](...continued)
knows that California is a source and destination point for illegal aliens.

Although this line of argument has been abandoned on appeal, we feel compelled to briefly address the government's apparent belief that the defendants' destination of California, a "source and destination point for illegal aliens," is a factor we should consider in determining whether Healy had reasonable suspicion to search the van. This court has previously noted the exceptionally weak value of this type of evidence in assessing whether reasonable suspicion existed to justify a search for drugs. <u>Williams</u>, 271 F.3d at 1270 (holding that, standing alone, information that "a vehicle hails from a purported known drug source area is, at best, a weak factor in finding suspicion of criminal activity"). This is particularly true because so many geographical locations have been found to fall within the category of "known drug source." <u>See</u> <u>United States v. Beck</u>, 140 F.3d 1129, 1138 & n.3 (8th Cir. 1998) (noting that the following locales have been characterized as "known drug sources" by law enforcement officials: Albuquerque, New Mexico; Chicago, Illinois; Dallas, Texas; Detroit, Michigan; El Paso, Texas; Fort Lauderdale, Florida; Houston, Texas; Los Angeles, California; Long Beach, California; Miami, Florida; New York, New York; Newark, New Jersey; Ontario, California; Oakland, California; Phoenix, Arizona; Portland, Oregon; San Diego, California; San Francisco, California; Arizona; California; Colorado; Florida; New Jersey; Texas; Washington; and the "entire west coast"). Since that decision, law enforcement agents have added a number of geographical locations to that already expansive list. <u>See, e.g.</u>, <u>United States v. Hornbecker</u>, 316 F.3d 40, 41 (1st Cir. 2003) (Southern California); <u>United States v. Aleman-Fuguereo</u>, 117 Fed. App'x 208, 209 (3d Cir. 2004) (Aruba, Curacao and St. Maarten); <u>United States v. Ibarra-Sanchez</u>, 199 F.3d 753, 759 (5th Cir. 1999) (Mexico); <u>United States v. $30,000 in U.S. Currency</u>, 30 Fed. App'x 473, 482 n.5 (6th Cir. 2002) (Columbus, Ohio); <u>United States v. Pitts</u>, 322 F.3d 449, 451-52 (7th Cir. 2003) (Northern California); <u>United States v. Kaguras</u>, 183 Fed. App'x 783, 784-85, 790 (10th Cir. 2006) (Seattle, Washington; British Columbia, Canada); <u>United States v. DeGasso</u>, 369 F.3d 1139, 1142 n.2 (10th Cir. 2004) (Chihuahua, Mexico); <u>Hurn v. United States</u>, 221 F. Supp. 2d 493, 503 (D.N.J. 2002) (Jamaica); <u>United States v. Hongla-Yamche</u>, 55 F. Supp. 2d 74, 75 (D. Mass. 1999) (Cameroon; West Africa).

To the extent that law enforcement officials seem primed to begin identifying "known illegal alien communities" this type of evidence appears to be of minimal, if any, evidentiary value.

reliable information did Burns provide to the dispatcher? and (2) Was that information sufficient to provide Healy with reasonable suspicion to stop the van?

**A**

As noted above, we review the district court's factual findings as to what information was provided under the "clearly erroneous" standard. Holt, 264 F.3d at 1228. "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Id. at 573-74.

In assessing the information possessed by a law-enforcement officer at the time of a stop, we apply the "fellow officer" rule. This requires us to look not to what the officer herself knew, but to "the collective knowledge of all the officers involved." United States v. Hinojos, 107 F.3d 765, 768 (10th Cir. 1997). This includes any information that was conveyed by an informant to a police dispatcher. Id.; White, 496 U.S. at 328-30 (1990); United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995) ("Tips, even if anonymous, coupled with independent police work, provide reasonable suspicion to warrant an investigative stop.").

Burns spoke only to dispatcher Ray, and thus we must determine what

8

information he conveyed to Ray. Our task on appeal is made more complicated because the district court did not make a specific numbered finding on this point. Reading the opinion as a whole, however, the district court found that only limited information was forwarded by Burns to dispatcher Ray: the van's "color, license [plate] number, [a description that it had] blacked-out windows, [and its] location, direction of travel, and number of occupants."

Although Burns testified that he provided additional information to dispatcher Ray about why he suspected the van's occupants were undocumented,[2] the district court rejected this testimony, stating "I find that Mr. Burns did not convey enough specific information about the reasons why he believed the van and its occupants were suspicious." Importantly, the government does not challenge the district court's finding that Burns did not provide information about his suspicions. Based on our independent review of the record as a whole, viewing the facts in favor of the defendants as we are required to do, see Holt, 264 F.3d at 1228, we cannot say that we have a "definite and firm conviction"

---

[2] Specifically, Burns alleged that he was suspicious of the van and its occupants because: (1) Two of the individuals in the group appeared to be guarding the others; (2) One of those men was wearing a "booney" hat and appeared to have a small object – possibly a knife – attached to his belt; (3) When the group entered the van, they opened the van door only wide enough that a single person could enter, preventing onlookers from peering inside the van; and (4) As he was leaving the store, he glanced at a newspaper article stating that if an undocumented alien made it past the U.S.-Mexico border the chance that the alien would be apprehended was akin to the chance of being struck by lightning.

that the district court's finding on this point was erroneous.  See Anderson, 470

U.S. at 573.  Neither the CAD report nor the recording of Burns' conversation

with dispatcher Ray indicates that Burns provided information about why he

suspected the van's occupants were undocumented aliens.  Moreover, neither

Leyba nor Healy provided clear testimony on this point.  The only testimony

indicating that Burns provided his reasoning is Burns' own, which the district

court found not to be supported by the record.[3]

Accordingly, under the very narrow standard with which we review the

district court's factual findings, we affirm the district court's finding that Burns

provided but the following limited, reliable[4] information to dispatcher Ray:  the

---

[3] To the extent the district court believed it was critical that the person that actually spoke to Burns testify at trial, we note that under the fellow officer rule it is immaterial whether the person that spoke to the informant testify.  Instead, the inquiry is merely whether the informant actually provided the information to a police officer or dispatcher.  Hinojos, 107 F.3d at 768.  We also note that the fellow officer rule does not stand for the principle that an officer has all the information known to both the citizen-informant and the officers involved in the investigation, as the government suggests.  Only the information the citizen provided to law enforcement personnel may form the basis for reasonable suspicion.  See Hinojos, 107 F.3d at 768.

[4] Defendants argue that none of the information Burns provided was reliable.  In determining the reliability of information supplied by an informant, we consider the credibility or veracity of the informant, the basis of the informant's knowledge, and the extent to which the police are able to independently verify the reliability of the tip.  White, 496 U.S. at 328-32; Adams v. Williams, 407 U.S. 143, 147-48 (1972).  Information that is given by an identified informant with first-hand knowledge is entitled to greater weight.  See United States v. Johnson, 364 F.3d 1185, 1190-91 (10th Cir. 2004); United States v. Jenkins, 313 F.3d 549, 554 (10th Cir. 2002).  The district court found that the

(continued...)

10

van's "color, license [plate] number, [a description that it had] blacked-out windows, [and its] location, direction of travel, and number of occupants."

**B**

We turn now to whether Healy had reasonable suspicion to stop the van based on the limited information, described in the previous paragraph, Burns supplied to dispatcher Ray. The district court ruled that this limited information was insufficient to establish reasonable suspicion. Burns stated that a large number of Hispanic individuals were traveling west on I-40 in a van with dark-tinted windows, and informed the dispatcher that he suspected they were undocumented, but never told the dispatcher why he believed they were undocumented. Burns apparently formed his suspicions based on his additional observations discussed above, and indeed these suspicions may give rise to an officer's reasonable suspicion in support of a stop, but the district court found that this information was not communicated to dispatcher Ray.[5] Based on the

---

[4](...continued)
limited information Burns did provide to dispatcher Ray was reliable. The record shows that Burns supplied dispatcher Ray with his full name and contact information, personally observed the situation that he described, and conveyed sufficient specificity regarding the van that there was a very low probability that the officers would have stopped the wrong vehicle. Thus, we cannot say the district court's finding was clearly erroneous.

[5] Because we conclude that the district court did not abuse its discretion in finding that Burns did not inform the dispatcher why he suspected the van was carrying undocumented aliens, we do not reach the question of whether Healy had
(continued...)

11

limited information that was provided to the dispatcher, we conclude that this does not present a legal basis to stop the van. At best, at the time Healy stopped the van he had "inchoate suspicions and unparticularized hunches" about whether the occupants of the van were engaged in illegal activity. See United States v. Salzano, 158 F.3d 1107, 1111 (10th Cir. 1998) (noting that "inchoate suspicions and unparticularized hunches . . . do not provide reasonable suspicion.") (citing United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)). Thus, Healy's stop of the van under these circumstances offended the Fourth Amendment.

## III

Accordingly, we **AFFIRM**. Judge McWilliams dissents.

Entered for the Court

Carlos F. Lucero
Circuit Judge

---

[5](...continued)
reasonable suspicion to stop the van had this information been provided. That said, under similar circumstances, when the informant conveyed the reasons for her suspicions, we have held that reasonable suspicion existed to stop a vehicle. See United States v. Leos-Quijada, 107 F.3d 786, 788-89, 794 (10th Cir. 1997) (holding that officer had reasonable suspicion to stop a vehicle when confidential informant personally observed the vehicle, provided a description of the vehicle and its direction, detailed the basis for her suspicion that the vehicle was engaged in illegal activity, and had previously given reliable information that led to the successful apprehension of individuals engaged in various criminal activity).

12